Plaintiff brought this suit for $132,776 damages resulting from personal injuries sustained in a fall from a fire escape. The defendants are A. H. Temple, his insurer, the Fidelity 
Casualty Company of New York, and the J. A. Johnson Erection Company. The last named defendant has been eliminated as a party to the suit upon admissions of counsel for plaintiff. The Royal Indemnity Company intervened in the suit, as compensation insurer of Grayson's, asserting its right to recover payments made to the plaintiff, in the event of his recovery in this action. After trial by jury there was a verdict in favor of the defendants and judgment was signed rejecting the demands of both plaintiff and intervenor, which parties have brought this appeal.
Sometime during the summer or fall of 1946, Grayson's Shops, Inc. (hereinafter referred to as Grayson's), lessee of a building located at 504 Texas Street in the City of Shreveport, owned by the Katzenstein family, engaged in an expansion and improvement program which involved certain remodeling work on the building, particularly the preparation for the use and occupancy of the second floor thereof in connection with the retail merchandising business in which Grayson's was engaged. The superintendent of this construction work, employed by Grayson's, was one Fred A. Baggett. During the process of the remodeling work Mr. Baggett was notified by the proper authorities of the City of Shreveport that before a certificate of occupancy could be issued and the second floor opened to use of the public the erection of a fire escape was required. It was determined that this appurtenance should be erected at the rear of the building and should be designed to lead from the second floor to the alleyway.
Baggett contacted several iron and steel construction concerns and finally reached a verbal agreement with the defendant, Temple, who contracted to build the fire escape for a consideration of $275. There is considerable conflict of testimony as to just what additional work Temple agreed to do with respect to the hanging, erection and balancing of the fire escape, with which points we will deal later in this opinion.
Temple's shop foreman, E. S. Regan, inspected and measured the premises, prepared sketches and superintended the fabrication of the fire escape. The only part of the construction which is concerned in this action is the balance arm, which was a cantilever type affixed by a pin to the axis where it joined the stairway or ladder portion of the fixture. Each of the cantilever arms was fabricated of two pieces of flat iron, three inches in width by one-fourth inch in thickness, welded edge to edge. The arms were joined by pieces of three-inch tubing, twenty inches in length, called spacers. Two diagonal pieces of bar iron on the upper plane of the balance arm were used as braces and at the end of the arm was affixed a 55 gallon oil drum, which was intended to be used as a receptacle for such ballast material as might be employed in balancing the ladder portion of the fire escape in order to hold the said portion at a proper distance above the floor of the alleyway when not in use. For the purpose of receiving the ballast material a hole had been cut in the upper side of the drum about the center thereof.
It is important to note that the term "balancing" is employed in its exact sense. In order to permit the proper use of the fire escape it was necessary that sufficient ballast be introduced into the receptacle provided to counteract the weight of the ladder section to the extent of lifting the same, when unoccupied by a person or persons required to descend in the event of an emergency. Yet it was also essential that *Page 141 
the receptacle be not over ballasted to such degree as would prevent the descent of the ladder section to the floor of the alley at and upon the introduction of a reasonable weight thereupon. In other words, the ballast had to be heavy enough to support the weight of the ladder section yet light enough to permit the lowering of the ladder section when and if its descent became necessary by any person or persons.
After completing the construction of the fire escape it remained at Temple's shop for some considerable period of time until Baggett requested its installation. In response to this request Temple advised Baggett that because of labor trouble he could not hang, that is install, the fire escape. At this particular time the J. A. Johnson Erection Company was doing some work for Grayson's and it was ascertained that the fire escape could be installed by this concern. Temple notified Baggett that this would necessitate an increase of $25 over and above his contract price of $275, and, after some negotiations between the parties, this additional amount was approved. Thereupon Temple delivered the fire escape to the alleyway in the rear of Grayson's establishment and it was installed by employees of the Johnson Company.
Some two days after installation Baggett undertook to balance the fire escape, and selected concrete for use as ballast material. With the aid of the plaintiff, Pouncy, concrete was poured into the opening of the ballast receptacle, the 55 gallon drum, to which reference has been made above. This operation was apparently undertaken on or about November 7th. It being believed that sufficient weight had not been provided, more concrete was poured into the drum on the morning of November 8, 1946, and, after this second operation, Baggett decided that too much weight had been added. Accordingly, he instructed the plaintiff, Pouncy, to take a hammer and chisel, clean off the concrete that had spilled on the outside, and begin the removal of some of the concrete that had been poured into the drum. While engaged in this operation, and during Baggett's absence, the balance arm buckled at a point near the axis and the plaintiff, Pouncy, was violently precipitated to the pavement of the alleyway. Plaintiff sustained serious skull injuries which necessitated the immediate removal of portions of the skull, imbedded fragments thereof and a portion of the front part of the left lobe of the brain. There can be no question as to the serious, painful and permanently disabling character of plaintiff's injuries, and the fact that he lived at all is a tribute to modern medical science and the skill of the surgeon who attended him.
The above are the material facts involved in the case, none of which are seriously disputed, save and except the extent of Temple's obligations under his contract and the amount of concrete which was introduced into the ballast drum by Baggett.
Plaintiff predicates his right to recovery upon certain specified charges of negligence on the part of the defendant, Temple, in the fabrication of the fire escape, namely, the use of weak, inferior material, the insufficient bracing of the balance arm, and the use of an improper ballast receptacle. After interposition of preliminary exceptions overruled by the trial Court, which do not appear to have been insisted upon before this Court, defendants answered, denying negligence on the part of Temple and asserting the contributory negligence of the plaintiff.
As above observed plaintiff requested and was granted a trial by jury which found for the defendants. Plaintiff zealously urges that this Court refrain from according any considerable weight to the findings of the jury. It is our view that the same weight, no more and no less, should be given the findings of a jury on questions of fact as is accorded those of a trial Judge. The findings of fact evidenced by the verdict of a jury should be carefully scrutinized and examined on appeal but should not be disturbed except in instances of manifest error. It is the province and obligation of this Court to carefully examine the facts as well as the law, which duty we have attempted to discharge in this case with painstaking care.
Careful examination of the record, which comprehends almost 500 pages of testimony, *Page 142 
indicates that there are four principal factors to be considered in connection with a determination of this case, which may be set forth as being:
1. The material used.
2. The bracing of the balance arm.
3. The placing of a stop arrestor, and,
4. The weight introduced into the ballast receptacle.
Plaintiff charges that the defendant, Temple, was negligent in using flat or bar iron for the construction of the arms of the balance section, and contends that Temple was obligated to use channel iron for this purpose. This claim is supported by testimony to the effect that the fire inspector who first advised Grayson's as to the requirement of a fire escape, pointed out the fire escape in the rear of the building occupied by the McCrory Company, next door to the Katzenstein building, and stated that the fire escape should be "like that"; that Baggett, according to his own testimony, advised Temple that the structure should be made of channel iron, to which requirement Temple agreed. This testimony of Baggett is directly contradicted by the testimony of Temple who stated that channel iron was not available at the time (the fall of the year 1946). The scarcity of iron and steel at the time in question is a matter of common knowledge, but additionally it is uncontrovertibly established by the testimony of numerous witnesses, particularly the experts who testified on behalf of plaintiff.
We do not find it necessary to burden this opinion with detailed descriptions of the several designs of iron and steel which are used in the fabrication of structures similar to the one under consideration here. It suffices to observe that the designs of steel and iron in order of preference, because of structural strength and corresponding safety elements, are designated as "I-beam", "channel", "angle" and "flat". Unquestionably the best engineering practices indicate the use of I-beam or channel iron. But it is established in this case that channel iron was not readily procurable and it was necessary for Temple to use iron of another design. In connection with this point we think plaintiff has failed to establish an agreement on the part of Temple to use channel iron. The only testimony on this point was that of Baggett and of Temple, one of which fully offsets the other, and when we consider the fact that the procurement of channel iron at the time was exceedingly difficult it would seem unreasonable to conclude that a man engaged in the business of fabricating steel structures would have agreed to use such a design.
There is a further point worthy of note in this connection, namely, that Baggett inspected the fire escape before it was delivered for installation; he was present on the premises during its installation and he proceeded to the work of balancing the structure without a word of objection or complaint, so far as the record discloses, to the use of flat instead of channel iron, although this fact was apparent. If the agreement had required the use of channel iron, certainly Baggett would have objected and would have refused to accept the substituted design. Baggett's strenuous insistence that he specified and required channel iron is contradicted by the testimony of both Temple and Regan.
At this point we think it proper to comment on the fact that counsel for the respective parties have seen fit in oral argument and briefs to attack the credibility of both Baggett and Temple. Unquestionably there are striking inconsistencies in the testimony of both of these individuals but we choose to regard these variances as being due to faulty recollection rather than any unworthy intent. We think this view was well expressed in the testimony of Mr. Baggett when he stated: "You know it has been two years since it happened and I can't remember that far back everything that happened."
It is for this reason that we are inclined to attach more than usual weight and importance to the actions of the parties at the time.
The charges of negligence against the defendant, Temple, are summarized as follows: *Page 143 
(a) Failing to use a known structural member in the stringers of the balance portion of the fire escape;
(b) If known structural members were not available, he was negligent in failing to combine the available metal so as to produce a known structural member;
(c) Failing to use lattice or double lattice type bracing and failing to use adequate spacers, or cross braces;
(d) Failing to submit detailed plans to the State Fire Marshal in accordance with accepted practice among the members of his trade;
(e) Failing to follow the standards of safety established by the City of Shreveport;
(f) Using too large a container for the concrete ballast, and then leaving, without instructions, to inexperienced persons, the putting in of the concrete.
Specifications (d) and (e) may be eliminated for the reason that they are not only ultra petitionem but are entirely irrelevant.
Specifications (a), (b) and (c) may be considered under one head and all will be disposed of by the finding of fact as to the proximate and efficient cause of the accident.
Plaintiff presented the testimony of a number of expert witnesses in support of the charges of negligence due to structural insufficiency; Mr. C. R. Minor, a graduate structural engineer from the University of Texas, who has been practicing his profession in Shreveport for some 10 or 12 years; Dr. Frank J. Germano, Associate Professor of Engineering Mechanics, Louisiana State University, whose major field of teaching is "Strength of Materials"; Dr. Roy T. Sessums, Dean of Engineering and Professor of Civil Engineering, Louisiana Polytechnic Institute; and Mr. J. W. Davenport, a broker dealing in steel structures, of long practical experience.
All of the distinguished witnesses above named were agreed on the proposition that the use of the materials and the design employed by Temple in the fabrication of the fire escape were not in accordance with the best engineering practices, and all of them, with the exception of Mr. Davenport, testified that they would not have used such material or design. Additionally there was considerable testimony on the part of these experts as to the margin of safety. Mr. Minor's testimony was to the effect that this margin should be in the ratio of 1 1/2 to 2. Dr. Germano said it should be 4 to 1, and Dr. Sessums that it should be 3 to 1. However, in commenting on this factor Mr. Minor appeared to make it clear that the strength of the materials used could be considered in arriving at a calculation with respect to this ratio. This factor of strength of materials does not appear to have been so closely discussed in the testimony of Drs. Germano and Sessums, and while each of these gentlemen testified that the strength should be calculated on a weight bearing basis they did not attempt to testify directly as to the weight bearing strength of the materials actually used.
In answer to the direct question "What would you say caused it to collapse?" Mr. Minor unhesitatingly answered: "The fact that there was too much load on it".
Mr. Davenport testified that the use of flat iron in the construction of similar structures was not uncommon and further testified that it was "too much weight" and "not the stringers that failed". Elaborating on this point he stated: "They fail regardless of what this is if you put too much back of them; if you overload it".
The experts were in close agreement as to the calculation of weights, and, using the minimum figures in round numbers, we think the following facts have been definitely established:
The weight of the stairway section or exit ladder, which was, of course, the main member of the fire escape, designed to be used for passage, is fixed at approximately 770 pounds. The weight of the balance ladder was shown to be approximately 215 pounds plus the weight of the ballast drum of some 25 pounds, giving a total of 240 pounds.
At this point in the computation of weights we are faced with the necessity of reaching a finding as to the amount of the concrete which was actually placed by Baggett in the ballast drum. According to *Page 144 
the uniform testimony the weight of concrete is fixed at 20 pounds per gallon. Baggett testified that he first put 20 gallons of concrete in the drum and the following morning added 2 1/2 gallons. This would give a total weight of 450 pounds. On the very face of the established facts it is evident that Baggett's testimony on this point is woefully in error because it is obvious that a weight of 450 pounds of concrete plus 240 pounds, the weight of the structure and drum, giving a total of 690 pounds, would not counter balance a weight of 770 pounds. Yet, according to Baggett's own testimony, he did have too much weight, and it was for this reason that he found it necessary to attempt to lighten the ballast which he had introduced into the drum.
As opposed to Baggett's testimony on the amount of concrete used, by reason of which he stated that the drum was less than one-half full, we have the testimony of Regan and the welder, Russell, who came to the scene after the accident for the purpose of cutting loose the twisted debris of the balance member, that the drum lacked only about two or three inches of being completely full, and the testimony of an apparently disinterested third party, one Thompson, that he estimated the barrel to be about three-fourths full.
On the basis of this testimony we hold it to be established that the ballast drum contained some 1000 pounds of concrete at the time of the accident. Adding this figure and an additional 150 pounds representing the weight of the plaintiff, Pouncy, we find that the balance arm was subjected to a total weight of 1390 pounds.
It must be borne in mind that the balance arm was designed for one purpose alone, namely to permit the operation of the suspended step section, the exit way of the escape. As a practical proposition, to fulfill this purpose it was necessary that the design and fabrication be planned for the support of a weight only slightly in excess of the proposed weight of the step section. According to the testimony of the experts this excess weight should have been only some 30 to 40 pounds. And, as logically contended by plaintiff, the additional accommodation of the weight of a workman who might enter upon the balance arm for the purpose of necessary repairs, painting, etc., should have been provided. Computing the necessary weight bearing support of the balance arm in consideration of these factors, we find that it was required to support a maximum weight of 770 pounds, being the weight of the step section, plus 30 pounds, the excess for the purpose of maintaining a balance and permitting operation, plus, say 200 pounds, an arbitrary allowance for the weight of a workman, or a total of 1,000 pounds.
It follows that when Baggett filled the ballast drum with some 1000 pounds of concrete he far exceeded the necessary weight and subjected the structure to an excessive and unreasonable strain. The added weight of plaintiff, Pouncy, was "the straw that broke the camel's back".
Under these findings of fact, which evidently accord with the conclusions at which the jury arrived on trial, we are firmly of the opinion that the sole, direct and proximate cause of the accident was due to the negligence of Baggett in overloading the ballast drum.
Even conceding, solely for the purpose of argument, that the design, construction and material used were all inferior, plaintiff has completely failed to establish by a preponderance of the evidence that any of these factors caused or contributed to the failure of the structure. On the contrary it appears clear to us that the weight of the evidence conclusively establishes the proposition that the failure was due entirely to over ballasting.
There is another element which has been injected into the charges of negligence with respect to the placing of the stop arrestor. For the reason immediately above set forth we are of the opinion that the position of this arrestor, with respect to the safety factor, is irrelevant. Nevertheless, our careful consideration of this point leads us to the conclusion that the position of the arrestor was determined by Baggett. It is quite true that the arrestor was placed by one of Temple's employees, the welder, Russell, but we *Page 145 
think plaintiff has failed to establish his contention that the welder selected the point at which the arrestor was fixed. The only testimony on this item was that of Baggett and Russell, the former asserting that Russell placed the arrestor and the latter as strenuously avowing that it was placed at Baggett's specific direction. Under this direct conflict it cannot be found that plaintiff's claim is entitled to greater weight that the denial of defendant's witness. Additionally, we note the facts that the material for the arrestor was supplied by Baggett and that Temple made an extra charge for the services of the welder in connection with the operation of placing the arrestor, which charge was paid without objection by Grayson's. Certainly then, this service was not included in Temple's agreement and the circumstance pointed out is indicative of the fact that the welder was at the time under the direction of Baggett and not Temple.
We now approach the consideration of the only remaining material question, namely, whether the balancing of the structure was an obligation of the defendant, Temple, under his agreement. Here again we are confronted with a direct and irreconcilable conflict. Baggett testifies unequivocally that Temple agreed to fabricate, install and balance the structure. Temple testifies equally as positively that his only obligation was to fabricate and deliver the fire escape. Temple's position is substantiated by the established facts. The installation was made not by Temple but by a third party who was paid by Temple, necessitating an additional charge which was made to and paid by Grayson's. It is unimportant whether this was done because the original contract did not obligate Temple to install the structure or whether it transpired as the result of intervening labor difficulties which made it impossible for Temple to carry out this obligation, since the incident is entirely distinct and apart from the balancing operation.
Plaintiff is under the compulsion of establishing his claim by a preponderance of the evidence. In this he has failed because the only evidence in support of his contention is the testimony of Baggett which is denied by the testimony of Temple. Again turning to a consideration of established facts it does not seem logical that Baggett would have voluntarily assumed the responsibility of the balancing operation about which he knew absolutely nothing, and that he would have used his time and that of the plaintiff, both being employees of Grayson's, in carrying out an obligation which was part of Temple's agreement. The testimony of Baggett himself impresses us with the casual manner in which he undertook to balance the structure. He called Temple, so he testified, discussed the materials available, and determined on the use of concrete because the sand, gravel and cement were at hand. Careful analysis of the testimony of the two witnesses and evaluation of their contemporary actions has firmly convinced us that the balancing was not an obligation of Temple but was an independent operation undertaken by Baggett and for the result of which he must bear full responsibility.
There is one further point which we have omitted to discuss but which is insisted upon in briefs on behalf of plaintiff, namely, that Temple was negligent in providing a 55 gallon container which was far in excess of the actual need and which negligent action in effect constituted an invitation to over ballast. We point out, in passing, that this argument is thoroughly inconsistent with plaintiff's contention that the balancing was an operation requiring performance by Temple under his agreement. If, as contended, Temple had obligated himself to balance the structure is must perforce be assumed that he would know what materials and what quantities thereof would be used for ballast and therefore it would be of no moment and of no concern to Grayson's or its employees whether the receptacle would hold 10 gallons or 100 gallons.
We further point out that plaintiff's insistence of negligence in this connection is untenable since, according to the uncontradicted testimony in the record, any *Page 146 
number of materials varying in weight and volume might be used for ballasting purposes.
We are indebted, and we wish here to acknowledge our obligation to diligent counsel for the parties plaintiff and defendant who have exerted every effort to lighten the labors of the Court by filing exhaustive, well prepared and able briefs dealing with every phase of this case.
In our consideration of counsel's briefs we do not find any substantial differences on propositions of law with respect to the questions here involved. The issues presented have involved almost exclusively questions of fact. We concede the general principles asserted on behalf of plaintiff to the effect that an intervening cause will not serve to relieve from liability where prior negligence was the efficient cause of the injury, nor where the intervening cause is set in operation by an original wrongful act, nor where the intervening cause need reasonably have been anticipated. But, under the facts which we have found in this case, we do not think these principles are applicable.
We know of no law, nor have we been cited to any, which would justify a holding that a manufacturer's negligence in the fabrication of a product would justify recovery in an instance where the negligence and the resulting defect neither caused nor contributed to the occurrence of an accident. Nor do we perceive that there is anything inherently dangerous in a fire escape. The danger which came into being in the instant case was not the result of any negligence of the defendant Temple, but was created solely and entirely by the negligence of another party who had no connection with the defendant.
It is entirely conceivable that an automobile might be afflicted with a number of defects occasioned by negligence in design, fabrication or assembly of a manufacturer. But in order for a driver to recover for injuries sustained in an accident it would be incumbent upon him to allege and prove that these defects or one of them was the proximate, moving and efficient cause of the accident.
In view of the conclusions reached we find it unnecessary to consider the question of the application of insurance coverage under the contract of insurance between the defendant, Temple, and the defendant, Fidelity Casualty Company of New York.
For the reasons assigned, the judgment appealed from, rejecting the demands of the plaintiff and the intervenor, is affirmed at appellants' cost. *Page 240